*KMC approved as to form 11/8/10. Issue No Bail warrants*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

NOV 08 2010

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

**UNITED STATES OF AMERICA**

**v.**

**CRIMINAL COMPLAINT**

**CASE NUMBER:** 1: 10 MJ 00314 DLB

Ernson MERISIER, a.k.a. "E"
Ruddys A. PIMENTEL, and
Marquis Allen MECA

(If search warrant is issued regarding this complaint,
indicate above the case number assigned.)

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. Beginning at a time unknown but no later than on or about August 1, 2010, and continuing to on or about November 5, 2010, in Fresno County, in the <u>Eastern</u> District of <u>California</u>, and elsewhere, the defendant(s) did,

Knowingly and intentionally conspire to manufacture, to distribute and to possess with intent to distribute 1000 or more marijuana plants and/or 1,000 kilograms or more of a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance,

in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846, with a mandatory minimum penalty of 10 years in prison and a maximum penalty of life imprisonment and a maximum fine of $4 million.

I further state that I am a(n) <u>Special Agent of the Drug Enforcement Administration</u> and that this complaint is based on the following facts: *(Official Title)*

**SEE ATTACHED AFFIDAVIT.**

Continued on the attached sheet and made a part hereof:   **X**  Yes  ___  No

_____
*Signature of Complainant*
**David Stahl, Special Agent**
**Drug Enforcement Administration**

Sworn to before me and subscribed in my presence,

11/8/2010
*(Date)*

at   <u>Fresno, California</u>
*(City and State)*

_____
*(Name & Title of Judicial Officer)*

_____
*(Signature of Judicial Officer)*

## AFFIDAVIT

I, David Stahl, being duly sworn, do hereby declare and state:

1.    I, Drug Enforcement Administration (DEA) Special Agent (SA) David Stahl, am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I am a Special Agent for the United States Department of Justice, Drug Enforcement Administration ("DEA") and have been so employed since November 2004.  Since that time, I have completed a sixteen week training academy at Quantico, Virginia.  This training included the investigation of violations of Title 21, United States Code, Sections 841(a)(1), 841 (b)(1)(A), and 846.  Additionally, I have five years of prior law enforcement experience as a police officer with the City of Dearborn, Michigan.  Requisite to that employment, I completed a sixteen week police academy.  That training included, among others, law enforcement techniques and narcotics enforcement.  While so employed, I arrested or assisted in the arrest of numerous suspects involved in narcotics distribution and possession.  During my employment with the Dearborn Police Department, I received formal training on interview techniques and informant management.  I am familiar with, and have participated in, all traditional methods of investigations, including, but not limited to, electronic

surveillance, visual surveillance, general questioning of witnesses, search warrants, confidential informants, pen registers, trap and trace, the use of undercover agents, and extensive analysis of telephone billing records for telephones used by narcotics traffickers and have been the affiant and assisted in court-ordered wiretaps. I am familiar with narcotics traffickers' methods of operation, including the manufacture, distribution, storage, and transportation of narcotics, the collection of money which represents the proceeds of narcotics trafficking, and money laundering. I have been involved in investigations into the unlawful possession of controlled substances with the intent to distribute, distribution of controlled substances, manufacturing of controlled substances and associated conspiracies, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. Through investigations and training, I have become familiar with the types and amounts of profits made by narcotics dealers and the methods, language and terms which are used. I have provided testimony before federal grand juries sitting in the Eastern District of California. Through my training and experience, I have also become acquainted with the identification of various controlled substances. I have also become acquainted with the various methods used by individuals to manufacture, possess, transport, and sell controlled substances in violation of federal law. Based on my experience and training, as well as information provided to me by Special Agents and Detectives involved in the investigation of this case, I am providing

the following facts.

2. This affidavit is made to support a complaint for Ernson MERISIER, aka "E;" Marquis Allen MECA; and Ruddys A. PIMENTEL charging them with Conspiracy to Manufacture, to Distribute, and to Possess with Intent to Distribute 1,000 or more marijuana plants and/or 1,000 or more kilograms of marijuana within the Eastern District of California, and elsewhere, in violation of Title 21 United States Code, 841(a)(1), 841(b)(1)(A) and 846.

3. The facts which establish probable cause for the arrest of the aforementioned individuals are either personally known to me or have been told to me directly by other Federal, State, Local law enforcement officers.

4. Beginning in or about August, 2010, the Fresno County Sheriff's Office ("FSO") and the Fresno Methamphetamine Task Force ("FMTF"), which is the Central Valley High Intensity Drug Trafficking Area (HIDTA) Task Force, have been investigating a Drug Trafficking Organization ("DTO") primarily operating within the county of Fresno. HIDTA is a multi-agency task force consisting of federal, state and local agencies which target major drug traffickers. A multitude of subjects in Fresno County are openly engaged in the cultivation of marijuana at various locations throughout the county. Fresno County Sheriff's Office Detectives traveled to many of the locations, one of which is located on the northwest corner of Central and Valentine Avenues in Fresno County. This is a rural, agricultural area of the

county, where historically various commercial crops are grown.   In this particular location, a significant expanse of the tract of land on the immediate northwest corner of the intersection is now occupied by a large-scale outdoor marijuana cultivation operation, which consisted of at least 1,000 marijuana plants.   The quantity and quality of the plants are striking, with the total amount estimated to number in the thousands and consisting of a range of high-grade marijuana plant strains.   This quantity of marijuana plants could ultimately produce thousands of pounds of processed marijuana, valued in excess of several million dollars on the illicit drug market.

5.   Based on the observations of Fresno County Sheriff's Detectives Mike Severson and Robin Gross, who is also assigned as a TFA with the FMTF, the specific layout of the marijuana cultivation operation in this location indicates it is an aggregation of adjacent marijuana gardens separated and/or sectioned off by an array of fencing.   It appears that each separate plot is posted with a different medicinal marijuana recommendation issued by Dr. Daniel Brubaker, D.O., or Dr. Terrill E. Brown, M.D., to numerous subjects who claimed California residency.   In one particular region of this northwest corner, there are about twelve different contiguous marijuana plots and, though divided by fencing, appear to be smaller units composing one larger single unit.   Specifically, the plots are adjoining, are surrounded by identical internal fencing, and are

encompassed on the outside perimeter by the same fencing.   Each individual section has one person's recommendation posted and is affixed with a lock.

6.   Several Fresno County Sheriff's Office Detectives, including Jason Hollins and John Avila, documented the names of the twelve subjects whose recommendations they observed posted. Background checks on those twelve subjects were conducted, which revealed that several had criminal histories for narcotic and/or violent offenses.   Some of those subjects included the following:

a.   Ong Rikki SONEPHADY ("ONG"), DOB 10-1-1971, has a listed address of 5160 E. Balch Avenue, Fresno, California.   A criminal history check of ONG revealed that he was arrested and convicted in 2003 for a violation of California Health and Safety (H&S) Code Section 11358 – cultivation of marijuana.   ONG was sentenced to two years in prison.   ONG's criminal history also includes a conviction in 1991 for a violation of California Penal Code ("PC") section 220 – assault to commit rape, for which he was sentenced to four years in prison; and a conviction in 2005 for a violation of California PC Section 245(a)(1) – assault with a deadly weapon not a firearm, for which he was sentenced to ninety days in jail and thirty-six months of probation.

b.   Khimphet Sonny KEOPHOUNSOUK ("KEOPHOUNSOUK"), DOB 10-2-1970, has a listed address of 4787 E. Lamona Avenue, Fresno, California.   KEOPHOUNSOUK was arrested in 2008 for a violation of

California H&S Code Section 11358 - cultivation of marijuana, and in 2009, it appears he was sentenced to a drug diversion program for that offense.

c.   Phetsakhone PHANOMSACK ("PHANOMSACK"), DOB 3-3-1969, has a listed address of 639 W. Ashcroft Avenue, Clovis, California.  PHANOMSACK's criminal history includes a 1993 arrest for a violation of California H&S Code Section 11351 - possession/purchase for sale a narcotic controlled substance, for which he was subsequently convicted and sentenced to twenty days in jail and thirty-six months of probation.  PHANOMSACK also has a prior arrest and conviction in 1991 for a violation of California PC Section 245(a)(1) - assault with a deadly weapon not a firearm, for which he was sentenced to six months in jail and three years of probation.

7.   The criminal histories of these subjects, in conjunction with the tremendous volume of marijuana being cultivated and the public hazard created by this situation (specifically, the potential for violence and the threat to the personal safety of innocent citizens and bystanders), prompted the FSO and FMTF to initiate surveillance operations on this group and their marijuana cultivation operation.  Several significant activities were observed during the surveillance operations to date, including the following:

a.   During the late afternoon and early evening of 9-

27-2010, Detective Severson, who was on surveillance in the area
of the Central and Valentine marijuana cultivation operation, saw
a gray 2003 Toyota pickup, bearing Tennessee ("TN") license plate
119PDB (R/O Savongsy, Bounepheng, 3904 Veals Rd, Murfreesboro, TN
37127) ("2003 Toyota pickup") leave from the grow site. It was
driving in tandem with a gray 2005 Toyota pickup, bearing
California license plate 7V41586 (R/O Phaphouampheng, Al, 3405 E.
Home Avenue, Fresno, CA 93703). The beds of both pickups were
loaded with a multitude of blue-green colored plastic bags, all
of which appeared to be filled. Detective Severson and other
surveillance units followed the pickups away from the marijuana
grow site, as they traversed southward and then eastward through
rural Fresno County. TFA Gross, who was assisting with the
surveillance operation, assumed a position about fifty yards
behind the pickups, as she followed them driving eastward on
American Avenue. She detected an overwhelmingly potent and
pungent odor, which, based on her training and experience, was
consistent with that of marijuana. The odor was inescapable and
unyielding, as she followed them to the area of 5215 S. Orange
Avenue in Fresno, California, where they turned onto and drove
down a driveway toward the house. Only after TFA Gross was no
longer following the vehicles did the odor dissipate. TFA Gross
subsequently drove by the residence at 5215 S. Orange Avenue
several times, and on each occasion she detected the same strong

odor of marijuana (that she had previously smelled while

following the pickups) lingering heavily in the air immediately

in front of the residence. The surveillance operation was

terminated at about 8:00 p.m., after no additional activity was

observed.

b.   On 10-2-2010, Detective Severson and assisting

units were on surveillance in the area of 5215 S. Orange Avenue,

Fresno, California, and Central and Valentine Avenues, the

location of the marijuana cultivation operation. Throughout the

course of the day, Detective Severson observed the gray 2003

Toyota pickup with the Tennessee license plate make three trips

to 5215 S. Orange Avenue. This location is a residence located

in rural Fresno County and is exceedingly difficult to

surreptitiously establish a clear, unobstructed view without

being detected. On one of the three trips, Detective Severson

was able to observe that nine large bags, all of which appeared

to be full, were unloaded from the bed of the 2003 Toyota pickup

and taken into the west side of the Orange Avenue residence.

Based on all of the observed activities, Detective Severson

believes the bags contained marijuana, which had been harvested

and transported from the Central and Valentine cultivation

operation.

c.   On 10-3-2010, Detective Severson and assisting

units were on surveillance in the area of 5215 S. Orange Avenue,

Fresno, California. During the course of the surveillance operation, Detective Severson observed the 2003 Toyota pickup with the Tennessee license plate arrive at the Orange Avenue residence and unload eleven large bags, all of which appeared to be full. Detective Severson utilized a spotting scope, through which he observed a green, leafy substance protruding from some of the bags. Based on Detective Severson's training and experience, he believes the substance was marijuana. All of the bags removed from the pickup were taken into the north side of the residence.

d.    The foregoing observations, coupled with ongoing surveillance activities, have led investigators to believe that the residence at 5215 S. Orange Avenue is a location where the harvested marijuana is being accumulated, dried, and manicured for distribution.

8.    Several other vehicles have been identified during this investigation, one of which is a dark-colored 2007 Nissan Armada, bearing Kansas license plate 984CAW (R/O Anderson, Kendra Sothala and Anderson, Jesse James, 130 S. Augustas, McPherson, Kansas)("2007 Armada"). The observations pursuant to this vehicle include the following:

a.    On 10-12-2010, at about 12:45 p.m., during a surveillance operation at 5215 S. Orange Avenue (the house previously identified as a location where the harvested marijuana

from Central and Valentine is being taken and accumulated), FSO
Detective Greg Siemens observed approximately four to six boxes,
described as 3'x 3' in dimensions, brown cardboard style boxes,
loaded into two different SUVs.  The manner and ease with which
the boxes were handled indicated to Detective Siemens that their
contents did not appear to be heavy.  One of the SUVs was
subsequently followed from the Orange Avenue house to 5871 E.
Florence Avenue, Fresno, California, where it arrived at about
1:12 p.m. and parked.  Approximately an hour and a half later, at
about 2:40 p.m., the 2007 Armada arrived at 5871 E. Florence
Avenue.  TFA John Wages observed four subjects exit the 2007
Armada, each of them carrying a light-colored object, about 2'x
1.5' in dimensions, and all consistent in appearance to the
other.  TFA Wages could not discern any other details from his
vantage point.

9.   A records check of the registered owners of the 2007
Armada, Kendra Sothala Anderson and Jesse James Anderson,
revealed that they appeared to be residents of Kansas, with valid
Kansas driver's licenses.  No current connections to Fresno were
located.

10.  On 10-14-2010, at about 3:30 a.m., surveillance units
conducted a trash run at 5871 E. Florence Avenue.  TFA Joe Demelo
sifted through the contents of the trash container that had been
positioned by the roadway in front of the residence, and he

located a green, leafy substance commingled with other items. Based on his training and experience, TFA Demelo identified the green, leafy substance as being consistent in appearance to marijuana and estimated the volume to be about one to two ounces.

11.   The observations of investigators, including the 2007 Armada's frequenting of the residence at 5871 E. Florence Avenue several times, the development of evidence – both physical and visual – that marijuana-related activities are occurring at the residence, and the seemingly transitory nature of the 2007 Armada's presence in Fresno led investigators to request and subsequently receive authorization for the use of a tracking device on the 2007 Armada.   On 10-14-2010, FSO Detective Ervin Mathis installed the device on the 2007 Armada while it was parked on the public roadway in front of 5871 E. Florence Avenue.

12.   During the days and weeks following the installation of the tracking device, FSO and FMTF investigators continued to monitor the movements of the 2007 Armada.   Not only was it traveling in and around Fresno, but it was tracked electronically as it traveled to places, such as San Diego, California, and Hollywood, California.

13.   Investigators continued to track the movements of the 2007 Armada, then, on 11-4-2010, at about 12:54 a.m., TFA Demelo checked the location of the 2007 Armada and discovered that it was headed eastbound on Highway 58 in California.   TFA Demelo

contacted TFA Gross several hours later, at about 6:45 a.m.,
after having tracked the 2007 Armada in the interim, and advised
her that the 2007 Armada was now on Interstate 15 in Nevada,
approaching the state of Utah.  TFA Gross informed FSO Detective
Jake Jensen about the situation and requested he coordinate a
vehicle stop of the 2007 Armada with the Utah Highway Patrol
("UHP").  Detective Jensen ultimately spoke with UHP Sergeant
Ryan Bauer and provided him with the 2007 Armada's description
and license plate number.  Sergeant Bauer, who was working
uniformed patrol in a marked UHP vehicle, agreed to look for the
2007 Armada and said that if he observed probable cause to stop
it, he would.

      14.  While Sergeant Bauer was working the area of northbound
Interstate 15 in Utah, near mile marker 51, he saw the 2007
Armada and initiated a vehicle stop after it failed to signal for
a lane change.  Sergeant Bauer stopped the 2007 Armada at about
9:15 a.m. and contacted its two occupants.  The driver, who was
wearing military fatigues, identified himself as Anh Huy NUYNH,
DOB 9-4-1974, with an address of 745 S. Burgan in Fresno,
California, and the passenger identified himself as Phousangkhy
PHANTHADETH, DOB 6-4-1973, with an address of 5871 E. Florence
Avenue in Fresno, California.  Sergeant Bauer noted that both
subjects appeared very nervous and had conflicting stories.  A K-
9 officer assisted Sergeant Bauer, and the K-9 alerted to the

presence of an odor of narcotics both on the exterior, then on the interior of the 2007 Armada.  A search of the vehicle revealed that the backseat of the 2007 Armada had been folded down to accommodate what initially appeared to be eight (8) large plastic bags that were covered by a green blanket spread out across the top of them.  Inside the large plastic bags there were a multitude of vacuum-packed, heat-sealed smaller plastic bags containing a green, leafy substance consistent in appearance to processed marijuana.  The total weight of the bags and their contents was about 180 pounds.  NUYNH and PHANTHADETH were taken into custody and transported to the UHP substation in Cedar City, Utah.

15.  Detective Jensen, Detective Severson, and TFA Gross traveled to Cedar City, Utah, where they interviewed NUYNH (who was subsequently identified as Manop SOUKSAVATH, hereinafter "SOUKSAVATH") and PHANTHADETH.  TFA Gross and Detective Jensen interviewed SOUKSAVATH, who was Mirandized from Detective Jensen's department issued Miranda warning card.  SOUKSAVATH answered yes to each question, indicating he agreed to waive his rights and answer questions.  SOUKSAVATH's statement included the following:

a.  SOUKSAVATH picked up a load of marijuana from a house located at 5871 E. Florence Avenue in Fresno, California, which is PHANTHADETH's residence.  The marijuana had been dropped

off at the house by an unknown subject, but he said it belonged
to PHANTHADETH's uncle. SOUKSAVATH had been directed to take the
load of marijuana to Boston and deliver it on Saturday (11-6-
2010) to a subject he knows only as "E." "E" is a Haitian black
male adult, about 28-34 years of age, 5'7"-5'8," 190-210 pounds,
with short black hair. SOUKSAVATH has delivered marijuana to "E"
in Boston on at least two (2) other occasions, one of which was
about two weeks ago. On that occasion, SOUKSAVATH and
PHANTHADETH both drove to Boston together and delivered eighty
(80) pounds of marijuana, for which SOUKSAVATH received about
$240,000 in U.S. currency that they transported back to Fresno,
California. Prior to that, in or around the summer of 2009,
SOUKSAVATH had transported about 1,000 pounds of marijuana in a
U-Haul truck to "E" in Boston. For that delivery, SOUKSAVATH was
given about $900,000 in U.S. currency that he drove back to
Fresno, California.

      b.   SOUKSAVATH described the method of the deliveries
to occur in a consistent pattern. SOUKSAVATH utilizes a phone
provided to him by "E," on which he checks in with "E" during his
trip from Fresno, California, to Boston, Massachusetts.
SOUKSAVATH's check-in intervals with "E" are about every twelve
(12) hours. When SOUKSAVATH gets into the Rhode Island area, he
calls "E," who subsequently sends SOUKSAVATH a text message with
the address where he should take the load. The address has

always been a house and a different house on each occasion.
SOUKSAVATH drives to the address given, parks on the street, and
he and "E," who emerges from the house upon SOUKSAVATH's arrival,
unload the bags of marijuana from the vehicle and take it into
the house.  Inside the house, there are often about three to four
other black male adults, who either observe or assist with
counting and/or surveying the bags of marijuana.  SOUKSAVATH is
given a partial payment upfront for the load, which on the last
trip (two weeks ago) was about $111,000 in U.S. currency, and
then he leaves the house and goes to a hotel. He waits at the
hotel for the next few days while "E" amasses the remaining
amount of money due for the load, and then he is subsequently
paid the money and drives it back to Fresno.

16.   On 11-6-2010, Utah, Fresno and Boston DEA special
agents, who were assisted by FSO, FMTF, and Tulare County
Sheriff's Department ("TCSD") personnel, coordinated a controlled
delivery of the 180 pounds of marijuana seized from SOUKSAVATH.
SOUKSAVATH had stated that "E" expected him to arrive in Boston
and deliver the load on Saturday (11-6-2010), so in the interim,
between the vehicle stop and the afternoon of 11-6-2010, agents
ensured that SOUKSAVATH continued to check-in with "E" as usual.
(All communications between SOUKSAVATH and "E" were witnessed by
agents.)  At about 1:51 p.m., a recorded call was placed to (781)
884-8032 ("E's phone") and SOUKSAVATH told "E" he was in Rhode

Island. A few minutes later, at about 1:58 p.m., SOUKSAVATH received a text message from "E's phone," which read, "Birch St, Roslindale MA 02131." Subsequent to that, at about 2:03 p.m., SOUKSAVATH's phone received a second text message that read simply, "82", with no other information.

17. Following the receipt of the above-cited information, at about 4:00 p.m., SOUKSAVATH, who was continuously monitored and supervised by agents throughout this transaction, drove a gray-colored Armada containing the approximate 180 pounds of marijuana down Birch Street in the area of 82 Birch Street, Roslindale, Massachusetts. During this time, FSO Lieutenant Neil Dadian observed a heavy-set black male adult, later identified as Ernson MERISIER, a.k.a. "E" ("MERISIER"), DOB 8-26-1984, on a cellular phone emerge from 78 Birch Street, the building next to 82 Birch Street. This subject was further described as about 5'9" in height with short black hair, wearing a white t-shirt, dark denim jacket, blue jeans, and clear eyeglasses; and he was looking in the direction of the Armada. SOUKSAVATH drove the Armada up to the area near 82 Birch Street, where he identified the subject standing outside as "E," so he parked the Armada and walked over to him. "E" greeted him and asked if anybody had followed him, to which SOUKSAVATH said no. "E" asked how many bags he had and SOUKSAVATH said around 9. SOUKSAVATH proceeded to begin unloading the bags of marijuana and was directed by "E"

to go to the residence at 78 Birch Street.  SOUKSAVATH and "E"
collectively unloaded all of the bags of marijuana and took them
up two flights of stairs into the only apartment on the third
floor of 78 Birch Street.  The bags were placed in the living
room of the apartment, which appeared to be a small one-bedroom
residence.

18.  Shortly after "E" and SOUKSAVATH completed carrying the
bags of marijuana into the apartment, DEA Special Agent (SA) John
McDonnell and Lieutenant Dadian observed two dark-complected
males, later identified as Marquis Allen MECA ("MECA"), DOB 5-26-
1984, and Ruddys A. PIMENTEL ("PIMENTEL"), DOB 3-21-1982, arrive
in a black Dodge Charger, bearing Massachusetts license plate
number 842KP5 (R/O Allen Marquis, 44 Seymour, Roslindale, MA).
Lieutenant Dadian described one subject as about 6'2", 210
pounds, and wearing a gray sweat-suit with a Boston hat.  The
second subject was described as about 5'8", 170 pounds, and
wearing a black sweat-suit and black Red Sox hat.  SOUKSAVATH,
who was in the apartment, said these two subjects walked into the
apartment.  SOUKSAVATH saw "E" and the two other subjects cut
open some of the bags to examine the quality of the marijuana.
"E" said he could work with this, and then they discussed the
price.  SOUKSAVATH said "E" calculated the value of the marijuana
to be $570,400, which is the total for 184 one-pound packages of
marijuana priced at $3,100 each.  "E" told SOUKSAVATH it would

take him a few hours to get $100,000 together, and they would give that to SOUKSAVATH at that time. "E" gave $1,000 to SOUKSAVATH, who told him he would be staying at a hotel in the North Attleborough area. SOUKSAVATH subsequently left the apartment, got in his car, and drove away. A few minutes later, at about 4:55 p.m., TFA Gross and DEA SA Chris Brackett were driving by 78 Birch Street when one of the subjects emerged from it and walked out toward the Dodge Charger. That subject is described as a medium to dark-complected male adult, about 5'8" in height, with short black hair, and wearing a black sweat-suit. Shortly thereafter, the other two subjects emerged, got into the Dodge Charger, and drove away. All of the subjects were empty-handed.

19. SOUKSAVATH was debriefed by DEA Task Force Officer ("TFO") Robert Perez and FSO personnel, at which time he provided some of the foregoing information. SOUKSAVATH was subsequently escorted to the Pineapple Inn in North Attleborough, Massachusetts, where he had stayed after previous deliveries to "E" in order to await final payments for those loads of marijuana. DEA special agents, FSO personnel, and assisting law enforcement officers coordinated an operation at this location that entailed the monitoring of the delivery of money to SOUKSAVATH, followed by the arrest of all involved subjects.

20. Meanwhile, DEA special agents, FSO personnel, and other

assisting law enforcement officers continued to conduct constant surveillance on the apartment at 78 Birch Street in Roslindale, to ensure no packages of marijuana were removed from the residence, and, if they were, to seize them and arrest involved subjects, accordingly.  Boston DEA Group Supervisor ("GS") Calice Couchman and other surveillance units at 78 Birch Street observed the Dodge Charger, in which the subjects had come and gone empty-handed a few times since the delivery of the marijuana, leave again at about 9:28 p.m.  The vehicle was occupied by three subjects and drove out of the area followed by surveillance personnel; however, they subsequently lost the Dodge Charger in traffic.  At about 9:51 p.m., SOUKSAVATH placed a recorded call to "E's phone" (previously identified as (781) 884-8032) and was told by "E" that he would be there in an hour.  Almost one hour later, at about 10:40 p.m., SOUKSAVATH got a text from "E's phone" that asked if he was in the same spot.  SOUKSAVATH sent a text back that said yes and provided his room number - 31. Several minutes later, at about 10:56 p.m., SOUKSAVATH received an incoming call from "E's phone" and was told they were pulling in.

21.  TCSD Detectives David Delacruz and Steven Sanchez, who were on surveillance in the room next to SOUKSAVATH's at the Pineapple Inn at 633 S. Washington Street in North Attleborough, Massachusetts, observed the Dodge Charger park in a motel parking

stall that was right by the window to their room.  They observed
three subjects in the vehicle, who were just minutes later
identified as the following: the driver at the time they parked
at the motel was MECA, the front passenger was MERISIER; and the
rear passenger was PIMENTEL.  MECA, who was wearing all black,
exited the driver's seat of the Dodge Charger, went around to the
passenger side, and lit a cigarette.  MERISIER, who was wearing a
white t-shirt, a black jean jacket, dark pants, a dark Boston
baseball cap, and clear eyeglasses, exited the front passenger
side and went to the trunk.  MERISIER removed something from the
trunk, covered it with what appeared to be a red-colored cloth or
clothing, and carried it to room 31.  PIMENTEL, the rear
passenger, stayed in the vehicle.

     22.  MERISIER arrived at room 31, where he was let in by
SOUKSAVATH.  Based on the subsequent debriefing of SOUKSAVATH,
MERISIER (who SOUKSAVATH later positively identified as "E")
brought in a Louis Vuitton handbag covered by a red hoodie.
MERISIER retrieved several stacks of U.S. currency from it, laid
them on the bed, and said it was "65," which SOUKSAVATH
interpreted to mean $65,000.  MERISIER stated that he still owed
SOUKSAVATH $504,400 (after the $1,000 earlier and the $65,000
now), so he took a wad of cash from his pocket and gave
SOUKSAVATH another $400 - to make it an "even $504,000."
MERISIER said he was going out of town for a few days, but he

would have the rest of the money by Tuesday.  MERISIER told
SOUKSAVATH to let him know if he needed anything during his stay
for the next few days.  MERISIER left the room shortly after that
and went back out to the vehicle.

23.   Detective Sanchez observed MERISIER enter the driver's
seat of the Dodge Charger (rather than the front passenger seat
that he had been in when they arrived), and MECA got into the
front passenger seat.  The Dodge Charger immediately drove away
from the motel, which was at about 11:02 p.m., and was stopped
down the street by marked North Attleborough Police Department
patrol vehicles.

24.   The three subjects in the Dodge Charger were identified
by the North Attleborough Police Department as indicated above:
the driver was MERISIER, the front passenger was MECA, and the
rear passenger was PIMENTEL, all of whom produced Massachusetts
Driver's Licenses with that exact information.  MERISIER had a
cell phone in his possession, telephone number (781) 884-8032,
which is the phone used by "E" to communicate with SOUKSAVATH.
Lieutenant Dadian went by the scene of the vehicle stop and
positively identified MERISIER, MECA, and PIMENTEL as the same
three subjects who had been at 78 Birch Street in Roslindale,
Massachusetts, earlier in the day, when SOUKSAVATH delivered the
approximately 180 pounds of marijuana.  (Specifically, Lieutenant
Dadian identified MERISIER as the subject who had emerged from 78

Birch Street and assisted SOUKSAVATH in carrying the bags of marijuana inside; and he identified MECA and PIMENTEL as the two subjects who had arrived shortly thereafter in the Dodge Charger.) MERISIER, MECA, and PIMENTEL were transported to the police substation, where they declined to provide any statements to law enforcement officers and requested attorneys.

25. During a subsequent interview of SOUKSAVATH by TFA Gross, he positively identified MERISIER as the subject he knows as "E," to whom he had delivered the marijuana and who had just given him the U.S. currency. SOUKSAVATH also positively identified MECA and PIMENTEL as the two subjects who arrived at 78 Birch Street earlier, when he had delivered the marijuana, and who had assisted "E" in checking the quality of the marijuana. The large quantity of U.S. currency given to SOUKSAVATH by MERISIER was turned over to DEA SA Rosemary Ramirez for an official count, seizure, and potential forfeiture.

26. A federal search warrant, authorized by the Honorable Jennifer C. Boal, U.S. Magistrate Judge in the District of Massachusetts, was served at 11:20 p.m. on 11-6-2010 at the third floor apartment of 78 Birch Street, Roslindale, Massachusetts. Two of the law enforcement officers present were TFA Gross and DEA TFO Robert Perez. A search of the premises revealed no people; however, there were numerous items of contraband and evidence, including the approximately 180 pounds of marijuana

that was the object of the controlled delivery.  The additional contraband and evidence seized included about 25-30 pounds of marijuana, a plastic bag containing about one (1) pound of an unknown off-white powdery substance, a plastic bag with a small quantity of a brown substance, a plastic bag containing a small amount of a black substance, and empty capsules.  Some indicia found at the apartment were in the name of MECA, including blank checks and mail addressed to him at that location.

27.  Based upon the foregoing, I believe that there is probable cause to believe that Ernson MERISIER, a.k.a. "E"; Marquis Allen MECA; and Ruddys A. PIMENTEL willingly and knowingly conspired to manufacture, to distribute and to possess with intent to distribute marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

28.  I, Dave Stahl, your affiant, swear that the facts presented to the U.S. Magistrate Judge in this Affidavit are true and accurate to the best of my knowledge.

David Stahl, Special Agent
Drug Enforcement Administration

SWORN AND SUBSCRIBED TO BEFORE ME
THIS ____ DAY OF NOVEMBER, 2010.

DENNIS L. BECK
UNITED STATES MAGISTRATE JUDGE,
EASTERN DISTRICT OF CALIFORNIA